**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT WEST VIRGINIA**
**CHARLESTON DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                                     **CRIMINAL NO. 2:14-cr-00117**
                                                          **(Judge Johnston)**

**DAVID E. RUNYON**


**DEFENDANT'S SENTENCING MEMORANDUM**

Defendant, David E. Runyon, by counsel, respectfully submits this Memorandum for consideration by this Honorable Court in advance of Mr. Runyon's sentencing hearing scheduled for April 30, 2015.

**Background**

Mr. Runyon worked for Arch Coal for almost 25 years.  He was first employed as a project manager at the Mingo Logan Coal Company in 1992.  He quickly was promoted to Underground Foreman, Longwall Coordinator and Mine Manager, before he became the General Manager at Mountain Laurel.  His rise was swift and steady.  He worked long hours, he was industrious and talented.   Along the way he developed prestige and power.  Unfortunately, he abused his power, primarily out of greed.  As a result of his criminal conduct, he lost a good job, he felt disgraced, and he became a convicted felon.

Yet, he did not sulk and feel sorry for himself, and almost immediately found a job working as a general laborer for modest wages.   He tore down houses and continues to do basic construction work.  During weekends, he has helped build houses for Habitat for Humanity.  He spread dirt and gravel, as well as filled in holes, at the Lenore Early Living Center to ensure the school grounds were safe for the kids.  He performs community service work for his church, and has helped members of his community who are infirm or elderly from shoveling snow to helping

them with their groceries.   He and his wife raised a son who is flourishing as a college student. Strange as it may seem, he has found a sense of joy and comfort in no longer having power and influence, having rediscovered the person he used to be by again living by the values that were so important to his parents.  In short, he has tried to be a better person.

## Overview

As counsel, we have had the opportunity to review plea agreements and stipulations of facts of related defendants, as well as attend plea and sentencing hearings.   In this regard, it is believed that the stipulation of facts entered into between the United States and Mr. Runyon ("Stipulation") accurately reflects the true facts as to what happened at Mountain Laurel during the various kickback schemes. Quite frankly, counsel believes that many of the defendants and their counsel have embellished the facts related to Mr. Runyon's conduct. While Mr. Runyon acknowledges his illegal conduct as set forth in the Stipulation, it is important to note that the vendors were participants who profited handsomely from the schemes.

## I.      Not a Classic Extortion Scheme

Vendors paid Mr. Runyon and other Arch employees kickback payments due to the threat of economic loss, and their desire to secure and retain contracts with Mountain Laurel.  As a result of their participation in the various schemes, vendors received many contracts from Mountain Laurel and significant income.   Many vendors received contracts "close to the margins" or at the high end of what Arch Coal would authorize, which further deepened their pockets.[1]

---

[1] Because many of the vendor contracts were at the high end of what Arch would authorize, Arch paid the vendor defendants significantly more per contract than if the contracts were awarded from a competitive bidding process.   Contrary to what some of the defendants have alleged, the high-end value of the contracts permitted some defendant vendors to pay the kickbacks from the excess awarded, which significantly increased their profits.

Significantly too, although there was a threat of retaliation, none of the vendor defendants lost a contract for failure to make kickback payments.    Interestingly, many vendors have represented in their sentencing memoranda that Mr. Runyon demanded they make kickback payments or their contracts with Mountain Laurel would be terminated.  In reality, when vendor defendants stopped making kickback payments, their contracts weren't terminated and they suffered no or little recourse despite its implied threat.[2]    In a typical extortion, there is a huge disparity between the extortionist and the extorted, which is not the case here for the following reasons and others:

**<u>The Extortion Scheme Involved Some of Dave Runyon's Good Friends who he had Known for Many Years</u>:**

- Steve Herndon was originally hired by David Runyon in 2001, as a favor to his father, David Herndon.[3]

- Dave Runyon continued to promote Steve Herndon through the years, due in part to the relationship he had with his father.

- In approximately 2009, Dave Runyon hired Dave Herndon, Jr. as an electrician at Mountain Laurel.   He was hired at the request of his father, Dave Herndon, Sr.

- Dave Runyon helped David Herndon get his business off the ground (MAC Mine Service).

- Alvis Porter was one of Dave Runyon's best friends.  They socialized together, visited each other's homes, and discussed their personal problems with each other.

- Alvis Porter's wife and Dave Runyon are relatives.

- Also note, James Evans, the vendor in the scrap metal kickback scheme, is Steve Herndon's brother-in-law

---

[2] Ronald Barnette, Scott Ellis, and Alvis Porter stopped making kickback payments at various times and they continued to receive contracts at Mountain Laurel.

[3] See Paragraph 41 of the PSR.

Scott Ellis concluded his sentencing memorandum by saying, "As with vendors who were caught up in the Mountain Laurel scheme, the message from Mr. Ellis's case is clear: business owners who are swayed to participate in the culture of corruption in southern West Virginia stand to lose everything that their hard work has earned them."   Counsel submits an alternative way to phrase Mr. Ellis' message is equally clear: When business owners unlawfully participate in a criminal scheme in which they are the exclusive vendors to an enormous operation and who receive all of the contracts worth vast amounts of income, they inherently risk losing everything if caught.

**Vendors Benefitted Financially:**

- Steve Herndon told Donald Carter that the Barnettes were making so much money they decided to no longer pay kickbacks.[4]

- In 2009, Jeff Miller attended a Christmas party at Jamie Evans' house.  When Miller saw the extravagant manner in which Evans' residence was constructed, it occurred to him how much money Evans and the others involved in the kickback schemes were making.[5]

- Scott Ellis bought a new house for $750,000, and paid $400,000 down and financed the balance.  When Ellis sold his old house for $220,000, he paid off the amount financed.[6]

- David Herndon recently purchased a lake house near Charlotte, North Carolina.[7]

- In 2008, Ronald Barnette's company (MRS) received approximately $1,100,000 in Mountain Laurel sales.  Mr. Barnette paid kickbacks to Mr. Runyon from 2009-2011. MRS received approximately $2,400,000 in sales in 2009; approximately $3,700,000 in 2010; and approximately $4,000,000 in 2011.[8]

- Steve Herndon left his position at Mountain Laurel and became a partner with Scott Ellis at Tri-State Mining (Tri-State) because he could make more money as a vendor than as a

---

[4] See Paragraph 61 of the Presentence Report (PSR).

[5] Jeff Miller made this statement during his January 28, 2014, Interview.  Miller worked as a warehouse clerk at Mountain Laurel and Steve Herndon was his supervisor.

[6] Steve Herndon made this statement during his May 1, 2014, Interview.   It is believed that Mr. Ellis purchased his new home in 2009.

[7] Jeff Miller made this statement during his January 28, 2014, Interview.   It is believed that David Herndon's new home is on Lake Norman and cost in excess of $2,000,000.

[8] The United States provided this information in discovery.   See Barnette sentencing memorandum. Interestingly, in 2012, when Barnette stopped paying kickbacks, MRS generated over $3,000,000 in sales with Mountain Laurel, and approximately the same in 2013.

Mountain Laurel employee.  Tri-State had its best year in 2012, after Herndon joined the company.[9]

• Scott Ellis always went back to Mountain Laurel, because he could not thrive without its business.[10]

• When Ronald Barnette first began paying kickbacks, his company (MRS) was billing Mountain Laurel $400,000-$600,000 per month.[11]

## II.    Unwarranted Sentencing Disparities

David Runyon agrees his sentence should be more significant than the other Arch Coal employees and vendors who participated in the various schemes.   However, others also played essential roles in the schemes.   Steve Herndon, as an employee of Mountain Laurel, often collected kickback payments, he determined the order in which vendors would receive contracts for rebuild jobs, and, at least one vendor characterized him as "the powerhouse" at Mountain Laurel.[12]

Steve Herndon established the bid-rigging scheme (Rebuild Scheme), in which three vendors submitted bids, two of whom knew they would not be selected to satisfy Arch Coal's requirement of three bids for any rebuild contract over $25,000.[13]   Similarly, Gary Griffith repeatedly received kickback payments from vendors, he participated in the rebuild scheme, and was instrumental in the development of the shuttle car scheme.[14]   Even though Mr. Runyon

---

[9]   Scott Ellis made this statement during his March 24, 2014, Interview.

[10]  James Evans made this statement during his January 30, 2014, Interview.

[11]  See Paragraph 45 of the PSR.

[12]  James Evans described Herndon as "the powerhouse" at Mountain Laurel during his January 30, 2014, Interview.

[13]  See Footnote 8 & 10, along with Paragraphs 18 & 19 in the PSR.  In addition, Donald Carter said, during his March 14, 2014, Interview, that Stephen Herndon asked him if he would consider being a third bidder for rebuild jobs.  Herndon said, "point blank" that he needed three companies to bid before he could send out equipment for rebuild.  Carter knew that Herndon had chosen the companies he wanted to deal with and only needed the bids to stay within corporate policy.

[14]  See Paragraphs 17 & 34-35 in the PSR.

admits he benefitted from the schemes, the disparity between the charges that were offered to Messrs. Herndon and Griffith are disproportionate.[15]

Herndon and Griffith's involvement in the schemes were most similar to Runyon's. However, Herndon was allowed to plead guilty to one-count of Structuring Transactions related to his illegal conduct as a vendor.   He was sentenced to probation.   On July 14, 2014, Gary Griffith was allowed to plead guilty to Making a Materially False Statement to a federal agent.[16] Every vendor was permitted to plead to an offense that was tangential to their illegal activities at Mountain Laurel from which they derived large amounts of income.

On May 29, 2014, Mr. Runyon accepted the best deal he was offered.  As a consequence, Mr. Runyon's sentencing range far exceeds any other defendant.   The United States apparently determined that Mr. Runyon should be singularly punished for the substantive acts related to the kickback schemes.   Mr. Runyon's base offense level substantially exceeds that of any other defendant and he alone is subject to a significant role enhancement, as well as a substantial enhancement for the total amount of kickback payments paid in the schemes.[17]

Further, only Mr. Runyon is responsible for paying restitution to Arch Coal.  There was a huge disparity in the seriousness of the charges offered to Mr. Runyon and the other defendants, all of whom profited from the same overall scheme. Mr. Runyon's sentence should be more significant, but it should also reflect his relative culpability compared to others and the sentences they have received.

---

[15] Even after Gary Griffith left Mountain Laurel due to health issues, he continued to share in the proceeds from the kickback schemes.

[16] Ironically, Mr. Runyon implicated himself and Griffith in the shuttle car kickback scheme during his proffer on April 28, 2014.   Griffith previously had told federal agents he was not involved in the shuttle car kickback scheme.  It was Mr. Runyon's statement which the government used to induce Griffith to plead to the Section 1001 violation.

[17] Approximately $1,800,000 was the total amount of money paid by vendors in the scheme.  Mr. Runyon received approximately $1,000,000.   However, his loss guidelines are tied to the $1,800,000.  He is the only defendant whose guidelines are tied to the total amount of money involved in the schemes.

### III.   David Runyon's Plea to Extortion Opened the Door to What We Believe Are Embellished Allegations Against Him

When it became clear to the participants in the kickback schemes that the government intended to hold only Mr. Runyon accountable for the entire extortion scheme, it was in their self-interest to embellish Mr. Runyon's role in the criminal enterprise and minimize their own. The vendors who dealt directly with Runyon presented themselves squarely as victims of a scheme for which Mr. Runyon was solely responsible.   For example:

- Ronald Barnette wrote in his sentencing memorandum, "In 2009, David Runyon – the general manager of Mountain Laurel and a powerful executive within Arch's corporate structure – approached Ronnie and demanded that he pay "kickbacks" in order to maintain work at Mountain Laurel…."[18]

- However, the Stipulation entered into between the United States and Mr. Runyon, presents a different version: In or about 2009, "…Ronald Barnette met with Dave Runyon and Mr. Barnette offered to pay Mr. Runyon directly ten percent of major equipment repairs."[19]

- David Herndon wrote in his sentencing memorandum, "Mr. Herndon was presented with a very serious threat by Runyon.  Either pay a quarterly kickback payment of $10,000, or Runyon would attempt to take the labor contract away from him….In the Summer of 2012, Runyon sent an auditor to examine Mr. Herndon's books. Following the examination, Runyon increased the required kickback from $10,000 a quarter to $60,000 a quarter.  Mr. Herndon again had no choice – and paid the kickback."

- However, the Stipulation again presents a far different version:  "Beginning sometime in early 2009, the contract labor scheme kickback scheme began when Mr. Herndon started paying $10,000 a quarter in cash kickbacks to Mr. Runyon in order to ensure MAC Mine Service retained the exclusive right to provide contract labor services (the "Contract Labor Kickback Scheme")…..Going forward, Mr. Herndon was doing very well financially and he and Mr. Runyon agreed Mr. Herndon would  pay $20,000 a month, or $60,000 a quarter.  Mr. Herndon agreed to make the payments because the Mountain Laurel contract was so lucrative."[20]

---

[18] When Ronald Barnette first began paying kickbacks, his company (MRS) was billing Mountain Laurel $400,000-$600,000 per month.  See Paragraph 45 of the PSR.

[19] Paragraphs 26, 45 & 73 in the PSR support the Stipulation, and not Barnette's version.

[20] The substance of a letter attached to the PSR, written by AUSA Thomas to Probation Officer Jeff Gwinn, dated April 1, 2015, supports an inference that MACs contract was lucrative and suggests that Herndon's rates were artificially inflated.  Counsel has not found any independent evidence in the record that supports Herndon's version.

Counsel believes that the vendors who dealt directly with Mr. Runyon have tried to capitalize on the fact that he pled guilty to Extortion by falling in line to support the conclusion that only Mr. Runyon should be held responsible for the criminal enterprise and in turn appear more sympathetic to the Court.

Mr. Runyon embraces the parties' Stipulation and understands he played a significant role in this offense in which he, along with Messrs. Herndon and Griffith, caused the vendor defendants to pay kickbacks due to the threat of economic harm.    However, counsel submits that the parties' Stipulation leaves room for the further conclusion that the defendant vendors had a strong incentive to participate in the various kickback schemes.  By participating in the schemes, they stood to make far more profits than if their contracts were earned through legitimate means at Mountain Laurel.  Therefore, even though the Court at times has referred to defendant vendors as victims, counsel believes they were complicit and clearly benefitted from their participation in the schemes.

### IV.    Mr. Runyon's Nature is to Help Others

Counsel has received in excess of 40 letters on Mr. Runyon's behalf, 13 of which we have provided to this Court for consideration (See Exhibit B).  We have not included letters from family members who obviously support and uniformly request a fair and just sentence for Mr. Runyon.  Two themes run through these letters. One, Mr. Runyon has historically sought ways to help others in need without any expectation of receiving anything in return.  Second, Mr. Runyon is a gifted leader.  The Guidelines are deficient in its ability to value such conduct.  The letters demonstrate Mr. Runyon's generosity of not only monetary resources at his disposal but also his time and attention.  These letters are filled with specific examples of Mr. Runyon giving advice, support, and encouragement to family, friends, neighbors, and employees, including former

employees, which had a powerful impact on their quality of life. Other letters reveal Mr. Runyon as having high expectations of those in his charge and yet at the same time he exhibited a genuine concern for his employees' well-being. Mr. Runyon's brand of leadership was: "Funerals are mandatory, weddings optional." In other words, Mr. Runyon never hesitates to help an employee in need, especially those who suffered through personal tragedy. This kind of leadership is genuine and cannot be faked.

In sum, these letters reveal another side of Mr. Runyon, which we ask the Court to consider when determining a just sentence. Mr. Runyon possesses compassion for others and leadership skills that can be used for good. A lengthy term of imprisonment benefits no one – it does not deter crime. Imagine the good that could come from a sentence combining a period of imprisonment with a mandate requiring that during his supervised release, Mr. Runyon must complete 400 hours of community service per year (in addition to full-time employment)?[21] Given the challenges facing the people of this district – poverty, obesity, addiction, child and elder abuse – a person with Mr. Runyon's skills and talents could be a cause for good. We respectfully request this Court consider a limited period of imprisonment combined with three years of supervised release with an annual requirement Mr. Runyon completes 400 hours of community service.

## V.    Concern for Employees

The tragedy in this story is that Mr. Runyon was a very successful manager, who had a very bright future with Arch Coal. Arch Coal profited handsomely from Mr. Runyon's efforts at Mountain Laurel during his tenure as General Manager from 2006 to 2014. Mr. Runyon was, in

---

[21] "Community service may be ordered as a condition of probation or supervised release." U.S.S.G. § 5F1.3 (2013). The Guidelines advise "community service generally should not be imposed in excess of 400 hours." Id., cmt. n. 1; but see *United States v. Graham*, 946 F.2d 19, 22 (4th Cir. 1991) (affirming sentence imposing a requirement of 500 hours of community service).

turn, compensated very well.  It is our understanding that no one has raised any issue whatsoever as to Mr. Runyon's concern for his employees as general manager.  This is in sharp contrast to misconduct when profits trumped everything, including the well-being of his employees.  Such is not the case with David Runyon.  He was under the same economic pressures as all Appalachian coal producers, and there is no question that Mr. Runyon was very successful mining coal. Nevertheless, the absence of any allegations of Mr. Runyon pressuring his employees to sacrifice safety for profits speaks volumes about his character and demonstrates his genuine concern for his employees and their loved ones.

## VI. Congress Intended First Time Offenders Convicted of Non-Violent Crimes to Receive Probation.

Congress charged the Sentencing Commission with creating guidelines that would produce sentences differentiating violent from non-violent crimes.  Unfortunately, the Commission continues to recommend relatively long sentences of imprisonment for individuals like Mr. Runyon, a first time offender convicted of a non-violent offense with no previous arrests or convictions. *See*, Recidivism and the First Offender, U.S. Sentencing Commission, 1 (May 2004)(http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.    The Commission has failed to devise a Criminal History Category (CHC) which further distinguishes defendants with one criminal history point and those defendants like Mr. Runyon with zero criminal history points. *Id.* at 1.  Defendants in either category are given the same criminal history score and fall on the same point on the Sentencing Table despite the inherent differences in their proclivity to commit crime.  Differentiating between the two groups is important because there is a clear difference in recidivism rates. *Id.* at 13.  For instance the recidivism rate of individuals with one criminal

history point is 22.6 percent versus the recidivism rate for offenders with no prior arrests and no criminal history, which is 6.8 percent. *Id.* at 13-14.  Mr. Runyon's recidivism rate should be even lower if the Commission's study took into account personal characteristics such as Mr. Runyon's age (46), his education background, history of gainful employment, and the non-violent offense he committed.

In sum, the Guidelines inadequately measure Mr. Runyon's risk of recidivism by placing him in the same CHC as someone who has a prior criminal conviction even though the Commission's research demonstrates Mr. Runyon is much less likely to re-offend. For this reason Mr. Runyon respectfully requests that this Court consider the Commission's research to support a variance sentence. *See Gall v. United States*, 552 U.S. 38, 49-50 (2007) (after correctly calculating the Guidelines range judges may decide whether an outside-the-Guidelines sentence is warranted based on an individualized assessment of the defendant).

### VII.    CONCLUSION

Attached hereto is a letter drafted and typed by Mr. Runyon in response to a question by his counsel (See Exhibit A).  The question was, "What would you tell the Court as to why you did this, considering your position with Arch Coal, the amount of money you were making and what you stood to lose?"  The letter is unedited by counsel and is the first draft given to counsel. It speaks volumes about who Mr. Runyon was and is.

We believe the disparity between the charges offered to other defendants versus the charges offered to Mr. Runyon, and the penalties to which he is subject relative to all the others, is unfairly disproportionate.  We spent a lot of time with the United States in the parties' Stipulation to present a fair picture of Mr. Runyon's criminal conduct and, within limits, an accurate portrayal of his role relative to the others charged in the various schemes.  In this

memorandum, we have tried to present information to sharpen the true nature of the various schemes, the relative culpability of those involved, and highlight that defendant vendors stood in a position to make large amounts of income from Mountain Laurel as a consequence of making kickback payments under the threat of economic harm.  Mr. Runyon fully acknowledges that he is guilty of extortion and understands the economic harm he caused.  However, we also did not want what we believe have been mischaracterizations and embellishments made against Mr. Runyon by many defendant vendors to go unchallenged.  We hope the Court will consider that the relationship between Mr. Runyon and the defendant vendors was not so dramatically imbalanced as they want you to believe.

In sum, there are reasons to vary downward and sentence Mr. Runyon to a limited term of imprisonment.  Mr. Runyon's (1) sincere expression of remorse as described in the PSR and his letter to the Court; (2) zero criminal history; (3) his assistance to the United States; and (4) the statistically low likelihood of Mr. Runyon re-offending are all appropriate factors under § 3553(a) warranting the requested sentence of probation.  For these reasons we respectfully submit that a limited sentence of imprisonment combined with 1200 hours of community service is a fair and just sentence for Mr. Runyon in light of the circumstances of his offense.

> DAVID E. RUNYON,
> DEFENDANT,
>
> By Counsel:
>
> /s/ Robert B. Allen
> Robert B. Allen (WV Bar No. 110)
> Samuel D. Marsh (WV Bar No. 6746)
> KAY CASTO & CHANEY PLLC
> 707 Virginia Street, East, Suite 1500
> P.O. Box 2031
> Charleston, WV  25327
> (304) 345-8900
> rallen@kaycasto.com

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT WEST VIRGINIA
CHARLESTON DIVISION**

UNITED STATE OF AMERICA

v.                                                              CRIMINAL NO. 2:14-cr-00117
                                                                        (Judge Johnston)

DAVID E. RUNYON

**CERTIFICATE OF SERVICE**

I, ROBERT B. ALLEN, counsel for Defendant, hereby certify that on the 23rd day of

April, 2015, I electronically filed the foregoing "Defendant's Sentencing Memorandum" with the

Clerk of the Court using the CM/ECF system, which will send notification of such filing to the

following:

> Meredith George Thomas
> Assistant United States Attorney
> Office of United States Attorney
> E-mail: meredith.thomas@usdoj.gov
> *Counsel for United States*

> /s/ Robert B. Allen
> Robert B. Allen (WV Bar No. 110)
> KAY CASTO & CHANEY PLLC
> 707 Virginia Street, East, Suite 1500
> P.O. Box 2031
> Charleston, WV  25327
> rallen@kaycasto.com