UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.  CRIMINAL NO. 2:14-cr-00117

DAVID E. RUNYON

## ADDITIONAL STIPULATION OF FACTS

The United States and David E. Runyon ("Mr. Runyon") stipulate and agree that the facts comprising the offenses of conviction in the Information in the Southern District of West Virginia, and the relevant conduct for those offenses, include the following, in addition to the facts contained in the original Stipulation of Facts attached to the plea agreement:

### Interactions with Vendors:

### A. The Rebuild Kickback Scheme

#### Donald Carter

As general manager at Mountain Laurel, Carter understood that Mr. Runyon held a powerful position. Carter knew that Stephen Herndon was the warehouse manager at Mountain Laurel and that Herndon worked closely with Mr. Runyon, and that Mr. Runyon controlled Mountain Laurel.

When Carter delivered the cash kickbacks to Stephen Herndon at Mountain Laurel, Carter saw Herndon call Mr. Runyon. As Carter left the property, he would see Herndon parked next to Mr. Runyon where Herndon shared Carter's kickback payments with Runyon.

Based on the foregoing, Carter believed that Mr. Runyon was aware that Herndon required him to make kickback payments to obtain work at Mountain Laurel. Carter also believed that Mr. Runyon required Herndon to share the payments with him.

During the course of the Rebuild Kickback Scheme, when Carter's payments were late, his next rebuild at Mountain Laurel

1

Defendant's Initials

would be delayed until he paid. When Carter did not pay the kickbacks in a timely manner, Herndon contacted Carter and pressured him to make the payments. Furthermore, at least one time when a payment was delayed, Mr. Runyon called Carter and told him, "You are doing business with Mountain Laurel and you have responsibilities."

**Scott Ellis and Stephen Herndon**

Based upon his interactions with Mr. Runyon and others at Mountain Laurel, Scott Ellis understood that his company, Tri-State Mine Service, would lose business and suffer economic harm if he did not pay kickbacks to Gary Griffith and Stephen Herndon (while Herndon worked at Mountain Laurel), who in turn would provide a portion of the kickback payments to Mr. Runyon.

At Mountain Laurel, Ellis initially delivered kickback payments to Griffith. Ellis often delivered the payments to Griffith in Griffith's office. Often, Griffith would immediately take the payment and go to Mr. Runyon's office where Griffith usually shared the payments with Mr. Runyon.

Once Griffith went on sick leave, Mr. Runyon told Ellis to deliver the kickback payments to Herndon. After receiving payments from Ellis, Herndon would share the payments with Runyon.

Ellis noticed, at times during the Rebuild Kickback Scheme, that if he tried not to pay or did not pay in full, he would lose business at Mountain Laurel. He would not receive any additional rebuild work from Herndon until he paid the amount of the kickback he owed. When Ellis' payments were late or not complete, Herndon reminded him how much he owed and that he would not receive another job until it was paid. On at least one occasion when his payment was delayed, Mr. Runyon told Ellis he could be replaced as a vendor.

Stephen Herndon, after joining Tri-State in 2011, also knew that Runyon could replace Tri-State as a vendor if he and Ellis did not pay kickbacks to Mr. Runyon. As Herndon had previously worked closely with Mr. Runyon while employed at Mountain Laurel, Herndon knew that Mr. Runyon had ultimate approval authority for vendors at the Mountain Laurel Property. Furthermore, most of Tri-State's business was at Mountain Laurel.

2

Defendant's Initials

### B. The Miner/Bolter Rebuild Scheme: Ronald Barnette

Another individual related to Ronnie Barnette ("Known Person Six") first made kickback payments to Gary Griffith on behalf of MRS. Griffith shared the kickback payments with Mr. Runyon and Stephen Herndon. Eventually, Known Person Six approached Herndon and told him that he was going to stop making kickback payments because he knew it was wrong and it weighed heavily on his mind. Known Person Six further told Herndon he knew that MRS would probably be cut off from work if he stopped making the kickback payments.

A short time later (in or near 2009), Ronald Barnette approached Mr. Runyon and offered to resume paying kickbacks on behalf of MRS to retain its work. Barnette then began making the payments directly to Mr. Runyon. Barnette and Mr. Runyon had general conversations about the Rebuild Kickback Scheme, during which Barnette learned that jobs were withheld from Carter and Ellis when kickback payments were not made in a timely manner. Barnette understood Runyon to be very powerful at Mountain Laurel.

Although eventually Barnette stopped making kickbacks to Runyon without retaliation, during the period that Barnette made the payments, he was aware that other companies had not received work when they failed to make kickback payments.

### C. The Construction Work Scheme: Alvis Porter

In or near 2009, Alvis Porter approached Mr. Runyon and offered to pay him kickbacks, in part, to ensure that his company would retain its contract with Mountain Laurel. At or near that time, during a conversation with Mr. Runyon, Mr. Runyon mentioned to Porter that vendors were making kickback payments to him. Porter was doing very well financially from his business with Mountain Laurel, and he did not want to jeopardize his business relationship with Mr. Runyon, who readily accepted the kickback payments and who Porter perceived to be very powerful at Mountain Laurel. Consequently, Porter offered to start paying kickbacks due to his fear that unless kickbacks were paid he would lose business and suffer significant economic loss.

Eventually, however, Porter stopped making kickbacks to Mr. Runyon without retaliation, but during the time he paid

Defendant's Initials

kickbacks he did so because he did not want to lose business and suffer economic loss.

### D. The Contract Labor Scheme: David Herndon

In or near 2009, D. Herndon paid Mr. Runyon kickbacks, in part, to ensure that his company would retain the exclusive contract labor contract at Mountain Laurel. At the time he started paying kickbacks, D. Herndon's company was enjoying a lucrative contract with Mountain Laurel which was renewable on an annual basis.

Because D. Herndon and Mr. Runyon enjoyed a friendship, Mr. Runyon had general conversations with him about the kickbacks that vendors were paying him. Through these conversations with Mr. Runyon, D. Herndon further learned that work was withheld from some vendors (specifically Carter and Ellis) when they did not make payments.

David Herndon paid kickbacks to Runyon because he feared that if he did not pay the kickbacks, he would lose the contract at Mountain Laurel. D. Herndon understood that Mr. Runyon had significant influence in the selection of large-scale vendors at Mountain Laurel and could trigger the replacement of D. Herndon's company with another vendor should Runyon choose to voice disapproval with D. Herndon's company to Arch Coal's headquarters.

### Mr. Runyon's Intent to Extort

Through these and other actions, Mr. Runyon intended to exploit the reasonable fear of economic harm of the vendors. Furthermore, Mr. Runyon knew that by causing the vendors' fear of economic harm, in addition to ensuring that the vendors received lucrative payments from Mountain Laurel, the vendors would continue to pay him kickbacks for the work that they performed at Mountain Laurel.

### Effect on Interstate Commerce

Coal mined at Mountain Laurel was sold outside the state of West Virginia. Furthermore the extortion and kickback schemes that Mr. Runyon engaged in precluded Arch Coal, a company publically traded on the New York Stock Exchange, and its wholly-owned subsidiary, Mingo Logan Coal Company, from receiving the best possible prices from vendors as none of the

4

Defendant's Initials

vendors were engaged in arm's length transactions with Arch Coal or the Mingo Logan Coal Company. For these reasons, Mr. Runyon's actions affected interstate commerce.

**Tax Evasion**

Mr. Runyon willfully evaded taxes on the amount of cash kickbacks he received in 2007-2012. Mr. Runyon provided evidence of his income to his tax return preparer, such as his W2, but intentionally did not provide the preparer with the evidence of the kickbacks he had received in 2012, or in 2007-2011. He also consistently underreported large amounts of income during those years, including 2012. The funds that he failed to report were the proceeds of extortion and fraud.

This Stipulation of Facts does not contain each and every fact known to Mr. Runyon and to the United States concerning his involvement and the involvement of others in the charges set forth in the Information, and is set forth for the limited purpose of establishing supplemental information to support a factual basis for the defendant's guilty plea.

Stipulated and agreed to:

_____  5-27-15
DAVID RUNYON                Date
Defendant

_____  _____
ROBERT B. ALLEN             Date
Counsel for Defendant

_____  5-27-15
SAMUEL D. MARSH             Date
Counsel for Defendant

_____  5-27-15
MEREDITH GEORGE THOMAS      Date
Assistant United States Attorney

5

Defendant's Initials