IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

```
_____x
                                :
UNITED STATES OF AMERICA,       :        Criminal Action
                                :
              Plaintiff,         :        No.  2:14-cr-00117
                                :
v.                              :
                                :        Date:  June 9, 2015
DAVID E. RUNYON,                :
                                :
              Defendant.         :
_____x
```

TRANSCRIPT OF SENTENCING HEARING HELD
BEFORE THE HONORABLE THOMAS E. JOHNSTON, JUDGE
UNITED STATES DISTRICT COURT
IN CHARLESTON, WEST VIRGINIA

APPEARANCES:

For the Government:        AUSA MEREDITH GEORGE THOMAS
                          U.S. Attorney's Office
                          P.O. Box 1713
                          Charleston, WV  25326-1713


For the Defendant:        ROBERT B. ALLEN, ESQ.
                          SAMUEL D. MARSH, ESQ.
                          P. O. Box 2031
                          Charleston,WV 25327-2031


Probation Officer:        Jeff Gwinn


Court Reporter:           Ayme Cochran, RMR, CRR

Proceedings recorded by mechanical stenography;
transcript produced by computer.

                    PROCEEDINGS had before The Honorable Thomas E. Johnston,

1

2    Judge, United States District Court, Southern District of West

3    Virginia, in Charleston, West Virginia, on June 9, 2015, at 2:03

4    p.m., as follows:

5                    COURTROOM DEPUTY CLERK:  The matter before the Court is

6    the United States of America versus David Runyon, criminal action

7    number 2:14-cr-00117, scheduled for sentencing.

8                    THE COURT:  Good afternoon.  Will counsel please note

9    their appearances?

10                    MS. THOMAS:  Meredith Thomas on behalf of the United

11    States.

12                    MR. ALLEN:  Robert Allen and Sam Marsh on behalf of Mr.

13    Runyon.  Mr. Runyon is present in the courtroom, Your Honor.

14                    THE COURT:  Good afternoon.

15            Mr. Runyon, will you please stand, and I will ask the deputy

16    clerk to administer an oath to you at this time.

17                    COURTROOM DEPUTY CLERK:  Please raise your right hand.

18                    **DAVID RUNYON, DEFENDANT, SWORN**

19                    THE COURT:  You may be seated.

20            Mr. Runyon, do you understand that you are now under oath

21    and you must tell the truth and, if you testify falsely, you may

22    face prosecution for perjury or for making a false statement?

23                    THE DEFENDANT:  Yes, Your Honor.

24                    THE COURT:  Throughout the course of this hearing, if

25    there's anything that occurs that you don't understand, I want

you to feel free to speak up and seek clarification.

Also, if at any time you need to confer with your attorneys, I will be pleased to pause the proceedings to allow you to do so.

Do you understand all that?

THE DEFENDANT:  Yes, sir

THE COURT:  All right.  Let me begin by talking about an issue we sort of came across here in the last couple of days, and that is the amended information.  The -- my -- actually, my law clerk gets some credit for catching this.  I have assumed, understood from the beginning, and I think the parties have, as well, quite frankly, that this was -- the charge contained in the information was extortion.

However, when you looked at the precise language of it, it arguably charged attempted extortion, which really doesn't make a whole lot of sense when you're talking about a scheme that went on for years.

At first, I looked at it as perhaps charged in the alternative, attempt -- attempted extortion and extortion, but I think, after informal conversations among the parties and the Court about it yesterday, that the most reasonable approach was to file an amended information, which it just dawned on me -- give me just a moment.

(Pause.)

THE COURT:  Ms. Thomas, I'm assuming that the change you made is in Paragraph 25; is that correct, the operative

paragraph of the extortion count?

MS. THOMAS:  That is the -- if that is the last paragraph, I have it somewhere, that would be correct.

THE COURT:  Okay.  So, it seemed to me that simply amending the information, frankly, to reflect what we -- I think what we all understood from the beginning, at any rate, and it would be the appropriate course of action then, and that there's really not much else to do on it.  It seems to me that there's no prejudice to the defendant in this.

Is there anything else we need to do with this?

MS. THOMAS:  Your Honor, the United States would ask that it just be put on the record with defendant's counsel and defendant that he is in agreement with this amended information.

THE COURT:  That's what -- yes, that was my intent with that question.  Mr. Allen, do you agree with what I've outlined?

MR. ALLEN:  We have no objection, Your Honor.

THE COURT:  Mr. Runyon, do you understand, though, what I've been talking about just now about the -- probably what was just a mistake in the language in the original information?

THE DEFENDANT:  Yes, sir, I do.  Yes, sir.

THE COURT:  And are you in agreement with the amendment?

THE DEFENDANT:  Yes, sir.

THE COURT:  And are you in agreement that -- I'm sure you've talked with your counsel about this.  Are you in agreement

that there's nothing more we need to do with this?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  Very well.  Then, I view that matter as put to rest.

All right.  Next, as -- as everyone who was here last time will recall, I had some questions about factual basis for these pleas, and the parties have filed a memorandum and, also, an additional rather lengthy joint stipulation that addresses many of these -- of the concerns, all the concerns that I raised, actually, and so I want to make the following findings with regard to the factual basis:

Extortion is not a charge that we see very often in this Court.  I've only had one other extortion case that I can recall and the facts were substantially different from this one, but in reviewing the law on this, what I found is that there is a -- at the rock bottom of what needs to be proven in an extortion case, there's a rather passive aspect to it, and so the essence of what I think is charged here, or what needs to be shown here, is that the defendant obtained money with -- from the victim with the victim's consent, that the defendant intended to exploit the fear of the victim, and that the victim's fear was both real and reasonable.

And does anybody object to that characterization?

I know that more can be proven, but I think, at rock bottom, that's what needs to be shown for the extortion part of -- as

opposed to the interstate commerce part of this crime.

Are the parties in agreement with that characterization?

MS. THOMAS:  Yes, Your Honor.

MR. ALLEN:  Yes, Your Honor, and I think that's justified under the *Billups* case, which is something we looked at very closely before we even entered the plea.

THE COURT:  Well, and I looked at some other cases, as well, and I think that's a fair characterization of it and, as that is characterized, the defendant's participation, and I'm not saying that this is necessarily a fair characterization in this case, but a defendant's participation can be somewhat passive in terms of simply receiving money under certain circumstances.

At any rate, I believe, based on what the parties have filed and my review of it, the -- I will, on that -- on the extortion element of the extortion charge, I will find that there is a factual basis as to all four of the schemes.

Now, with regard to interstate commerce, which is an element under the Hobbs Act, I reviewed the filings of the parties.  I'm not sure I'm convinced on all of the arguments that were made, but one that I did find particularly helpful, and I think applicable in this case, is the following.  This is a -- well, I'm going to cite a couple of cases for this.

The extraction attributed from local contractors erecting facilities to serve an industry engaged in interstate commerce satisfies the jurisdictional requirement of the Hobbs Act.  That

is a concept that appears to have originated in an Eighth Circuit case, *Hulahan v. U. S.*, 214 F.2d 441, pinpoint 445, from 1954.

As also has been cited in another case I've seen, this is cited more than once, is *U. S. v. Addonizio,* 451 F.2d 49, pinpoint 77, a Third Circuit case from 1972, in which cert was denied at 405 U. S. 936.

Also, *U. S. v. Daley*, 564 F.2d 645, pinpoint 649, a Second Circuit case from 1977.

First of all, I would say, with regard to that, that providing services for a mine is, in my view, logically and functionally equivalent to erecting facilities in an industry that would be engaged in interstate commerce.

Beyond that, I will easily find that the coal industry -- that this was a coal mine in which coal was mined and, as the parties have agreed to be sold out of state, the coal industry is -- is easily involved in interstate commerce. Even if this coal is being sold entirely in the State of West Virginia, the coal industry is certainly an industry that was a past interstate commerce and, therefore, and -- and this mine, therefore, was involved in interstate commerce. It was owned, wholly owned, by Arch Coal, which is a publicly traded company that is easily involved in interstate commerce and, beyond that, the coal was mined to fuel the interstate power grid, which is obviously a part of interstate commerce. So, I have no problem finding that the interstate commerce element is met and, therefore, a factual

basis for the extortion count.

Now, with regard to the tax evasion count, I will repeat, just for ease of reference here, that the elements of the crime of tax evasion set forth -- that is codified at 26 U. S. C. Section 7201 are:

One, willfulness;

Two, the existence of a tax deficiency;

And, three, an affirmative act constituting an evasion, or attempted evasion, of the tax, and that's -- those elements are set forth, among other authorities, in *United States v. Jinwright,* 683 F.3d 471, pinpoint 476, a Fourth Circuit case from 2012.

The second and third elements are rather easily met in this case, so that's not been an issue.

The term "willfulness," however -- the parties added to the information in the stipulation. However, it is my intention, and I've indicated this informally to the parties before the hearing to ask just a couple of questions of the defendant to firm up the record on that particular point. Is there any objection to that?

MS. THOMAS: No, Your Honor.

MR. ALLEN: No, Your Honor.

THE COURT: All right. Mr. Runyon, you've -- you've stipulated, agreed, let me just -- let me get the document so I can reference it to you. Give me just a moment.

(Pause.)

1          THE COURT:  Mr. Runyon, I'm referencing a document that

2    is entitled "Additional Stipulation of Facts" that was, I think,

3    filed with the joint memo on the questions that I posed at the

4    last hearing.  It's docket 41 that was filed on May 27th, 2015.

5    That is a five-page document.  Do you have it in front of you?

6          THE DEFENDANT:  Yes, sir.

7          THE COURT:  All right.  And, on the last page of that

8    document, is that your signature which appears there?

9          THE DEFENDANT:  Yes.

10          THE COURT:  And have you read the additional

11    Stipulation of Facts?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  All right.  And do you agree that all of

14    the facts contained in that stipulation are true?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  All right.  And are those your initials

17    that appear on the other pages of that additional Stipulation of

18    Facts?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  All right.  So, in that document, you've

21    stipulated that you intentionally failed to give your tax

22    preparer the information about the kickbacks you received; is

23    that correct?

24          THE DEFENDANT:  That's correct.

25          THE COURT:  All right.  And you understand that you are

required under the law to report the kickbacks as income and pay

taxes on it?  Did you understand that?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  And you -- you failed to do that and, did

you fail to do that, in part, because you didn't want to pay

taxes on the kickbacks?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  And, also, perhaps because you didn't want

there to be a record of you having received those kickbacks?

        THE DEFENDANT:  Yes, sir.

        THE COURT:  And would your answers to those questions

be the same for tax years 2007 through 2012?

        THE DEFENDANT:  Yes, sir

        THE COURT:  All right.  Based on those responses, I

will also find that there is an adequate factual basis for Count

2, the tax evasion count.

    Now, Mr. Allen, have you received and read and reviewed --

have you reviewed with your client a copy of the Presentence

Report?

        MR. ALLEN:  We have, Your Honor.

        THE COURT:  All right.  And, Mr. Runyon, have you

received and read and reviewed with your counsel a copy of the

Presentence Report?

        THE DEFENDANT:  Yes, Your Honor.

        THE COURT:  Has the government received and reviewed a

1    copy of the Presentence Report?

2            MS. THOMAS:  Yes, Your Honor

3            THE COURT:  All right.  As I indicated last time, I had

4    some questions regarding some of the guideline calculations.  The

5    parties have assisted me on that, as well, with their filings

6    and, in particular, there are two things I want to -- I want to

7    discuss.

8        First, the leader or organizer enhancement, the -- give me

9    just a moment.  I need to find my notes.

10       (Pause.)

11           THE COURT:  All right.  On the leader and organizer --

12   leader or organizer enhancement, to which I would note that the

13   parties have neither objected; in fact, they have agreed, the

14   first question is whether the defendant was an organizer, leader,

15   manager or supervisor of criminal activity in this case, the

16   four-part extortion scheme involving Mountain Laurel.

17       Application Note 4 to Section 3B1.1(a) provides the

18   following discussion regarding the defendant's role in criminal

19   activity:

20       In distinguishing a leadership and an organizational role

21   from one or -- of mere management or supervision, titles such as

22   "kingpin" or "boss" are not controlling.  Factors the Court

23   should consider include the exercise of decision-making

24   authority, the nature of participation in the commission of the

25   offense, the recruitment of accomplices, the claim of a right to

1    a larger share of the fruits of the crime, the degree of

2    participation and planning or organizing the offense, the nature

3    and scope of the illegal activity, and the degree of control and

4    authority exercised over others.

5         There can, of course, be more than one person who qualifies

6    as a leader or organizer of a criminal organization or a

7    conspiracy.  This adjustment does not apply to a defendant who

8    merely suggests committing the offense.

9         In interpreting Section 3B1.1, the Fourth Circuit noted that

10   there is a difference between the potential to exercise control

11   over an operation with the actual exercise or control.  That is

12   *United States v. Cameron*, 573 F.3d 179, pinpoint 185, a Fourth

13   Circuit case from 2009.

14        In particular, the Fourth Circuit noted that in the cases in

15   which this Court has affirmed the application of leadership

16   enhancement, there was evidence that the defendants actually

17   exercised authority over those participants in the operation or

18   actively directed its activities.

19        In this case, the relevant factors support a finding that the

20   defendant was an organizer or leader of a criminal activity that

21   included the four component schemes.

22        First, the defendant exercised decision-making authority by

23   holding ultimate approval authority for vendors at the Mountain

24   Laurel property, demanding to meet and directly approve at least

25   one vendor, that would be Mr. Carter, and directly making

kickback agreements with at least two vendors, Barnette and Porter.

Second, the nature of defendant's participation in the scheme as the direct contact for some strict schemes, source of approval for others, and recipient of ill-gotten gains in those activities. The defendant did not serve as a direct contact.

Third, the record does reflect that the defendant appears to have recruited Stephen Herndon to participate in the scheme with Ellis. The defendant actively participated in many schemes or parts thereof and helped plan others by approving vendors.

The nature and scope of the criminal activity was relatively large and developed -- and involved the defendant, as well as two other employees of Mountain Laurel, that being Stephen Herndon and Griffith and six vendor -- six vendors.

The defendant certainly was in a position to exercise control over others in a variety of ways and he certainly gained a significant, if not the most significant, share of the kickbacks compared to the other people involved. All of these factors taken together indicate that the defendant was an organizer or leader.

Now, with regard to the other component of this enhancement, the parties have argued for the application of five or more participants. That was what had me struggling at the -- one of the things that had me struggling at the last hearing. Clearly, the defendant, as well as Stephen Herndon and Griffith, were

participants.  The only other possibilities of people who
participated and who knowingly were a part of the scheme would
have also been accurately characterized as victims of the
extortion, so we took a look at the law on that.

It seems that under the Fourth Circuit case of -- it's
*Spitler*, and I don't have the -- let me give you a cite on that.
I think everybody has that because it was briefed.  *United States
v. Spitler*, 800 -- tell me if I get this cite wrong -- 800 F.2d
1267, a 1986 Fourth Circuit case; is that right?

Anyway, everybody briefed it, so they know the *Spitler* case.
Under *Spitler*, the Fourth Circuit held that victims may be
charged with aiding and abetting or conspiracy to commit
extortion if there -- if they participated in a way that can be
characterized as more than mere acquiescence.

More active participants in this case that look more like
active participants than victims arguably are certainly Barnette
and Porter.

However, the Fourth Circuit's position in *Spitler* appears
that it may be a minority position among the circuits and,
moreover, although *Spitler* was reaffirmed by the Fourth Circuit
in a case called *Ocasio*, that -- the United States Supreme Court
has granted cert on this very issue in *Ocasio* very recently and
we may anticipate the Supreme Court weighing in on this issue
sometime in the next year or so.

As a result, I'm a little hesitant to rely on *Spitler* as the

sole basis for this enhancement, and I will make that finding, but if I -- if that was the only finding I had to make, I'm not sure I'd be entirely comfortable with this enhancement.

However, the guideline applies for an alternative basis to the five or more participants if the activity was otherwise extensive. So, a defendant may receive a four-level enhancement if he was an organizer or leader of criminal activity and if that criminal activity was otherwise extensive.

In assessing whether an organization is otherwise extensive, all persons involved during the scope of the entire offense are to be considered. Thus, a fraud that involved only three participants, but used the unknowing services of many outsiders, could be considered extensive.

Additionally, in determining whether criminal activity is otherwise extensive, many reviewing courts have examined the totality of the circumstances, including not only the number of participants, but also the width, breadth, scope, complexity and duration of the scheme and, for everything I've said so far, I would cite to Application -- 3B1.1, Application Note 3, and a Fourth Circuit -- unpublished Fourth Circuit case, *United States v. Beverly,* 284 F. Appx. 36, a 2008 Fourth Circuit case.

In this case, the criminal activity associated with the four schemes involved at least three active participants and over a million dollars in kickbacks. That's not to mention the vendors. Additionally, the schemes utilized the assistance of numerous

unwitting participants, such as other employees of Mountain Laurel, and intermediate financial institutions.

Further, the schemes were complex and involved rigging, at least in one of them, involved rigging Mountain Laurel's bidding system for jobs and had a substantial impact on the vendor interactions at Mountain Laurel.

Finally, the extortionate schemes occurred continuously over a period of a number of years. It's charged as about seven years, I believe, and the Fourth Circuit has previously held in *United States v. Boccone*, B-o-c-c-o-n-e, I'm not sure I've pronounced that correctly, 556 Fed. Appx. 215, a 2014 Fourth Circuit case, the Fourth Circuit found that criminal activity was otherwise extensive where, among other things, it lasted for five years.

As such, the Court finds that the totality of the circumstances indicate that the criminal activity provided in Count 1 of the information was otherwise extensive. The Court thus finds that the defendant was an organizer or leader of criminal activity that involved five or more participants or, alternatively, and this is what I rely on primarily, was otherwise extensive. Therefore, the leadership role is appropriate.

I would also -- all right. Now, I also want to talk about relevant conduct. I've found that all four schemes -- there's a factual basis for all four schemes, so they are all easily

relevant conduct.

I would note that the parties, and I'm noting this because I think this is important, especially for the government and, also, for defense counsel for future reference. The parties filing on this mixed standards and, in particular, mentioned or -- and incorporates the standard from 1(b)1.3(A)(2), which refers to common scheme or plan or course of conduct.

That standard expressly does not apply in this case because this is a Hobbs Act count and that is expressly excluded from application under 3D1.2. So, I just want -- and the government is already aware of this, but I want to underscore that I'm looking at 1B1.3, especially at (A)(2), very carefully, and it doesn't apply in this case.

Nonetheless, I believe that all of the conduct involved in the case and, in particular, the dollar figures, but all of it, are covered as relevant conduct under Section 1B1.3(A), both Subsections (a) and (b) and, also, potentially (A)(4). Also, I note that there's no objection. So, I wanted to place all of those findings on the record for the benefit of the parties and the record.

That leaves, as I understand it, a whole series of what have been called objections by the defense, but are there -- do we really have objections outstanding?

MR. ALLEN: Your Honor, I'd like for Mr. Marsh to address that.

1          THE COURT:  That's fine.  I would be happy to hear from

2  Mr. Marsh.

3          MR. MARSH:  Thank you, Your Honor.  We do not.

4  Basically, the remarks that we made to Mr. Gwinn with respect to

5  the draft PSR, really more in line with comments or additions

6  requested be made to various paragraphs.  I think technically our

7  objection letter only included two technical objections to the

8  information contained in Paragraphs 25 and 28.  I believe Mr.

9  Gwinn incorporated those changes in at least Paragraph 28.

10      Nevertheless, as the Court is aware, Ms. Thomas responded to

11  our objections or comments and/or request for notes to be

12  included, and most of that information is set forth in the

13  addendum to the final PSR, and so the Court now has, and I'm sure

14  the Court has reviewed that, and the government's position, as

15  well as the defendant's position, and the Court can obviously

16  evaluate those positions and attribute whatever weight the Court

17  deems fit.  So, having said that, the -- Mr. Runyon has no

18  further objections to the PSR.

19          THE COURT:  All right.  Very well.  That was my

20  impression, is that, for the most part, the ones that -- of

21  substance have been addressed one way or another by the probation

22  officer.

23      I read through them all.  I found them to be of marginal

24  interest and really not having much of an impact on the overall

25  sentencing decision.  Certainly, no impact on the guideline

calculation.

So, based on that, to the extent that there are remaining objections, they're overruled, and I will adopt the Presentence Report and addendum, as written.

I would note that I have received a sentencing memorandum from both sides. I received a joint memorandum and a stipulation in response to my inquiries at the last hearing.

Also, filed with and already part of the record, filed with the defendant's sentencing memorandum, were a letter from the defendant, as well as, I believe, 13 other letters on behalf of the defendant, which I have read, and they are already a part of the record.

On August 7th, 2014, the defendant appeared before this Court and entered a plea of guilty to Count 1, which charges him with extortion by wrongful use of fear of economic loss in violation of 18 U. S. C. Section 1951, and Count 2, which charges him with tax evasion, in violation of 26 U. S. C. Section 7201. I will now adjudge the defendant guilty of each of those crimes and accept the plea agreement that was previously filed.

All right. Ms. Thomas, I understand that the government now has a motion under Section 5K1.1.

MS. THOMAS: Yes, Your Honor, and I would also like to proffer the additional Stipulation of Facts, the original, to the Court. We have filed one, but it's not the one with the original signatures, so I don't know if the Court would like to have that.

1          THE COURT:  All right.  That's fine.  I don't think

2     it's necessary --

3          MS. THOMAS:  Okay.

4          THE COURT:  -- because there's a copy attached to your

5     joint memo.

6          MS. THOMAS:  Okay.

7          THE COURT:  So, I don't think it's necessary.

8       First of all, do we need to hear this motion in camera?

9          MS. THOMAS:  No, Your Honor.

10          THE COURT:  All right.  Then, you may -- and I didn't

11     get an actual written motion per policy now, correct?

12          MS. THOMAS:  You did not get one.

13          THE COURT:  All right.  Very well.  I'll hear your

14     motion.

15          MS. THOMAS:  The United States makes a Motion for

16     Substantial Assistance under 5K1.1.  Mr. Runyon provided

17     information that substantially assisted in the prosecution of

18     Gary Griffith, who is a retired maintenance manager at Mountain

19     Laurel.  Griffith made a false statement to IRS agents regarding

20     his role and knowledge of kickbacks at Mountain Laurel.

21       At the time, the United States already had some information

22     regarding his involvement in kickbacks at Mountain Laurel, but

23     Runyon came in before he signed his plea agreement for a limited

24     proffer regarding a very specific kickback scheme, providing new

25     information regarding that specific scheme between him, Gary

Griffith, and another vendor that refurbished shuttle cars at
Mountain Laurel.

Runyon's information significantly assisted in Griffith
pleading guilty to making a false statement about receiving
kickbacks and the facts agreed upon and alleged in Griffith's
information and in the Stipulation of Facts was the information
Runyon provided regarding kickback schemes that focused on
shuttle car re-builds.

One of the factors in consideration for a 5K motion is the
truthfulness, completeness and reliability of any information or
testimony provided by the defendant.  Just to make the Court
aware of this, after Mr. Griffith decided to plead guilty, there
was a small factual discrepancy regarding who began that kickback
scheme, but Runyon did, at the behest of his attorneys, consider
the discrepancy, and he admitted that while he initially thought
it was Griffith that began the scheme, it could have been him.

Furthermore, in the course of his cooperation and
assistance, at first, he was somewhat reluctant to cooperate with
the United States after that initial proffer.  However, he did
come around and he became very helpful to the United States and
the United States made inquiries and that information was
reliable and he even further volunteered information to the
United States.

He also assisted in information regarding another vendor
paying kickbacks at Mountain Laurel, but the United States would

1    need to approach the bench about that.  It's minor in comparison

2    to the assistance he provided in regards to Mr. Griffith,

3    however.

4              THE COURT:  Do you want to approach the bench?

5              MS. THOMAS:  We can, very briefly.

6              THE COURT:  It's up to you.

7              MS. THOMAS:  Can that be -- can that portion be sealed

8    that I talk about at the bench?

9              THE COURT:  It may be.

10        You may approach.

11        And, Mr. Allen, Mr. Marsh, and your client will need to come

12   up for this, and we'll place this portion of the transcript under

13   seal.

14        (At side-bar.)

15                    **SEALED SIDE-BAR CONFERENCE**

16   ████████████████████████████████████████

17   ████████████████████████████████████████████

18   ██████████████████████████████████████████

19   ████████████████████████████████████

20   ██████████████████████████████████████

21   ████████████████████████████████████████████

22   ██████████████████████████████████████████████

23   ██████████████████████████████

24   ████████████████████████████████████

25   ████████████████████████

███████████████████████████████████████

(End side-bar.)

THE COURT:  All right.  At this point, we will be unsealed from here on out.

All right.  Ms. Thomas, does that conclude your remarks?

MS. THOMAS:  Yes, Your Honor.

THE COURT:  All right.  Mr. Allen, anything to add?

Well, before I get to that, Ms. Thomas, how many levels are you asking for?

MS. THOMAS:  We're suggesting four levels, Your Honor.

THE COURT:  All right.

Mr. Allen, anything to add to that?

MR. ALLEN:  No, Your Honor.  I mean, we have cooperated, and I think Mr. Runyon is entitled to the motion, and we'd ask the Court to grant it.

THE COURT:  All right.  Very well.

Pursuant to 5K1.1 of the guidelines, the Court may depart from the guidelines upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person.

In determining the appropriate reduction, the Court may consider:

One, the significance and usefulness of the defendant's assistance;

Two, the truthfulness, completeness, and reliability of any

information or testimony provided by the defendant;

Three, the nature and extent of the defendant's assistance;

Four, any injuries suffered or any danger or risk of injury to the defendant or his family resulting from the assistance;

And, five, the timeliness of the defendant's assistance.

I will adopt as my findings the comments of the government with regard to those factors. I will grant the motion, and I will grant a four-level reduction under Section 5K1.1.

I am now ready to give my tentative findings as to the applicable guidelines.

First, Ms. Thomas, is there a motion for the third level for acceptance of responsibility?

MS. THOMAS: Yes, Your Honor.

THE COURT: All right. That motion will be granted.

There -- as the parties are aware, and as outlined by the probation officer in the Presentence Report, there's two different ways to calculate the guidelines that all results in the same ultimate calculation. I'm going to give them based on grouping them together, which I believe is the way it's set forth in the Presentence Report.

Therefore, with regard to Count 1, I find a Base Offense Level of 18; plus five for the amount of the loss; plus two for the abuse of a position of private trust; plus four for the aggravating role, for an adjusted offense level of 29.

Count 2, a Base Offense Level of 18, plus two for exceeding

criminal proceeds exceeding $10,000.00, for an adjusted offense level of 20.

The highest of the two adjusted offense levels is applied. Therefore, that is a 29; minus 3 for acceptance of responsibility; minus 4 for the 5K1.1 motion, for a Total Offense Level of 22; a criminal history category of I based on 0 criminal history points, yields an imprisonment range of 41 to 51 months; 1 to 3 years of supervised release as to each count, which would run -- is mandated by statute to run concurrently; a fine range of $7,500.00 to $3.6 million; and restitution to Arch Coal as to Count 1 of $1,000,000.00 and, by agreement as to Count 2, of $325,485.05 to the IRS, as well as a -- and I understand some of that has been paid, a good bit of that has been paid on both counts, and a mandatory special assessment of $200.00, which I also note has been paid.

Are there any legal objections to my tentative findings as to the applicable guidelines?

MS. THOMAS:  No, Your Honor.

MR. ALLEN:  No, Your Honor.

THE COURT:  All right.  I note, also, that Arch Coal is identified as a victim in this case and the IRS.  Typically, a governmental victim doesn't make any sort of presentation, although I won't exclude them, if they want to.

Ms. Thomas, does anybody -- first of all, have the victims been accorded all of their rights and notifications under the

various victims rights statutes and regulations?

MS. THOMAS:  Your Honor, while we didn't consider Arch Coal to be a statutory victim under this case because the loss caused by the defendant's actions under the Hobbs Act was not caused by the specific conduct underlying the -- I'm sorry, the defendant's offense, he -- we have agreed that he will pay a million dollars to Arch Coal in -- under the statute.  I think that Mr. Bryant -- oh, Mr. Carey is here on behalf of Arch Coal and they are aware of the proceeding.

THE COURT:  Do they wish to -- Mr. Carey, do you wish to address the Court on behalf of Arch Coal?

MR. CAREY:  No, Your Honor.

THE COURT:  All right.  Very well.

I assume the same is true of the IRS?

MS. THOMAS:  Yes.  They are here, also.

THE COURT:  All right.  And they don't wish to address the Court?

MS. THOMAS:  I don't believe so.

THE COURT:  All right.  Very well.

All right.  Mr. Runyon, at this time, the Federal Rules of Criminal Procedure give the right to make any statement that you would like to make, although you're not obligated to make any statement.  However, if you do choose to make a statement, I would ask that you stand to do so.

THE DEFENDANT:  Yes, sir.  I made a huge mistake.  I

shouldn't have done what I've done.

I hurt a lot of people.  I hurt my family.  I hurt my career.  I hurt the employees that had worked for me.  And I hurt Arch Coal.  I can sit here and apologize all day, but if I could go back and do it again, I would change everything.

I think what best describes my position on all of this is the letter that was submitted to you that I wrote myself.  I think that tells about how I've felt about this situation.  I made a huge mistake, but I would just like another chance to be a better man, and I think I am a better man right now, and do better things with my life, and get my life back on track.

THE COURT:  Thank you, sir.  You may be seated.

Anything else on behalf of the defendant before I impose sentence?

MR. ALLEN:  Briefly, Your Honor.  I think our sentencing memorandum pretty well laid out our position with regard to the scheme that took place there at Mountain Laurel and how it came about and the various participants, the roles, and so forth, and our objective was, we feel like that there was -- there was a little bit of -- after we entered a plea to extortion, we feel like we left the door open as to some embellishments as to what's happened, but I know the Court has read it, and I know the Court can listen and has taken it into consideration based on the Court's questions and so forth, with regards to our Stipulation of Facts, and that's all basically we

want to ask.

With respect to the -- would you like me to address the 3553 factors at this point in time?

THE COURT:  This is your opportunity to address the Court before I impose sentence, Mr. Allen, so I will leave it up to you as to your presentation.

MR. ALLEN:  All right.  Well, I think there are some things that I would like the Court to take into consideration with regard to mitigation, and one of the things that -- you know, I think is important, and one of the issues that was raised with the Court at one point in time is, you know, where was -- where was the retribution when the payments stopped, okay?

And I think, taken into consideration, these people were friends.  They socialized together, they worked together, and they -- I mean, it was a close group of people that were working together down there at Mountain Laurel.

Now, these vendors, they were good vendors.  They provided good services.  They did good work.  And, I think, when some of them stopped for various reasons, and the Court has been aware of the various vendors that stopped making payments, there was no retribution, and I think the reason and the justification for that was, Mr. Runyon ultimately put the best interest of Mountain Laurel in front of his getting the kickbacks.

I mean, like I said, you know, they quit paying.  At the same time, they were providing good services, they were providing

good work, and he needed to keep that good work and good services

being provided to Mountain Laurel, and so there wasn't

retribution.

There's no question about the fact that these people were

fearful, had economic fear with regard to the, you know, making

the payments.  They knew how much power he had.  He knew -- they

knew how much authority he had, but I think those things are also

important with regard to taking into consideration the fact that

there really wasn't -- in the ultimate end, there really wasn't

any retribution to these people that stopped getting kickbacks.

With regard to the seriousness of the offense and the just

punishment of the offense, as this Court is well aware, Mr.

Runyon has lost his job.  He lost a brilliant career.  He worked

hard.  He came up through the ranks.  It's almost inconceivable

that he would accept this kind of money in light of the situation

that he was in but, you know, people make mistakes.

And, I think, based on the letters and comments of the

people that have been close with Mr. Runyon, a lot of employees,

a lot of community members, and so forth, that have written

letters, you know, I think they paint a picture of Mr. Runyon as

being a good person.

He's good with people.  He took care of his employees.  He

cared about his employees.

He was one of these types of managers that, you know, that

the people that worked for him, the managers -- you know,

marriages are optional; funerals are mandatory.  You know, you
support the people that work for you.  You take good care of
them.

     And I think, basically, Mr. Runyon is a very good person.
He made a serious, terrible mistake, and he's paid a serious and
terrible price already, in addition to what the Court will impose
here today, and with regard to incarceration or any other
penalties.

     I think we can take into consideration, when we're talking
about the seriousness and just punishment, the fact that, even
though there were some other employees of Mountain Laurel that
participated in this, Mr. Runyon is the one that pled basically
to the substantive offense of extortion.  He's the only one that
pled guilty to that subsequent offense.

     And, like I say, it really wasn't a classic extortion
scheme.  I think -- and vendors, in this particular case, they
did more than acquiesce, they participated, but I think the
government has acknowledged, also, that they benefited greatly.
I mean, they were making huge amounts of money.  Arch was doing
well, the vendors were doing well, and Mr. Runyon was doing well,
and everyone was basically sharing the wealth down there.

     As far as the punishment, the just punishment, I think the
message has already been sent that the vendors and operators
that, you know, if you engage in this type of conduct, you're
going to be prosecuted.

We're talking about an economic crime here, Judge, and that doesn't justify it.  That doesn't -- it's a violation of the criminal law, but at the same time, I think economic crimes are looked at a little bit differently and I would ask the Court to take that into consideration.

As to the adequate deterrence, he has no prior criminal record.  In our sentencing memorandum, we talked a little bit about the fact of the way the sentencing guidelines are structured; that, you know, the person that comes in with an absolutely clean record is penalized just a little bit because people that have one -- one violation are in the same category. We have discussed that and I'm sure the Court has, too.  I think Mr. Capece has brought that to the Court's attention on several occasions in the past.

He's worked hard all of his life and, as far as deterrence, he's -- he was fired and -- and one of the things I think speaks volumes about Mr. Runyon, he was fired and, immediately after he got fired, he gets a job as a laborer in the community that he worked in, that he lived in, that he was a powerful person in and, since his conviction and since his firing, he's worked basically 40 hours a week doing common labor and, if that's not humiliating based on where he was and where he is, and it shows the type of guy I think he really is, that he's not going to sit home, he's not going to engage in a lot of self pity and, you know, oh, woah-is-me-type conduct, that he's made a mistake, he's

1   owned up to it, he needs to get it behind him, and he needs to

2   move forward, and I think -- I think what's happened to him is

3   also -- it takes -- certainly, is an adequate deterrence.

4       With regard to protection of the public, he's 47 years old.

5   He has no prior criminal record, no prior arrest, no indication

6   of any violence whatsoever in this particular case, and we would

7   -- I mean, basically, he's no danger to his community.  He's been

8   working in that community, he's still lives in the community, and

9   he's a first-time offender of a non-violent crime.

10      We would ask the Court, basically, to grant a downward

11  variance from the guideline range that the Court has found

12  appropriate, at this particular point in time, to avoid any, what

13  we believe would be a sentencing disparity, based on the types of

14  crimes that the government has allowed all of the other vendor

15  participants, Mr. Herndon, Mr. Griffith, and each of these other

16  people to plead to that don't even have guidelines that even come

17  close to what Mr. Runyon is exposed to, and we would ask the

18  Court to take that into consideration, grant a downward variance,

19  so that there will not be an unwarranted discrepancy and

20  disparity in the sentencing of the individuals that are all

21  involved in these -- in this scheme.

22      Like I said, and I'm repeating myself a little from my

23  sentencing memorandum, but he's been a hard worker.  I think he's

24  got a lot that he can offer in the future to his community, and

25  his family, and to this state.

1    I just, you know, it's just such a waste of -- what a shame.

2  I mean, what a waste of time, and I would ask the Court to take

3  this into consideration and give him the opportunity to start

4  over, to rebuild, and make a contribution, and to, you know, like

5  I say, the community and the state.

6    And I -- and, like I say, Judge, I think -- I've known Mr.

7  Runyon for a long time and, like I say, he's a good person,

8  basically, but he made a terrible, terrible mistake and he's paid

9  dearly for it.  Thank you.

10            THE COURT:  Thank you, Mr. Allen.

11            MR. ALLEN:  Yes, sir?

12            THE COURT:  I said thank you, Mr. Allen.

13            MR. ALLEN:  Oh, I'm sorry.

14            THE COURT:  Ms. Thomas?

15            MS. THOMAS:  I'll be brief.  The Court is quite

16  familiar with this case and the roles the individuals involved

17  have played.

18    This was not just a mistake.  This was years of extortion,

19  and years of playing favorites with vendors, and Mr. Allen is

20  absolutely right, what a waste of talent.  No one has ever argued

21  that Mr. Runyon was a bad coal miner.  He did make a lot of money

22  for Arch Coal, but if he had been spending his time, instead of

23  extorting vendors and making sure they were current on these

24  payments, actually doing what he was supposed to do, think about

25  how much more profitable that mine could have been.

He was the person who made the decisions, the person ultimately in charge of Mountain Laurel and, because of this, he was the person who maintained the corruption there. He was the person who decided who were the winners and who were the losers. He kept it a secret from his employer, and he made sure that the vendors that he selected would go along with his plans by hinging their financial success, or their downfall, on their payment of kickbacks, or what they considered to be their potential economic downfall, and so they went along with his arrangement.

They paid, they continued to seek work at Mountain Laurel, and they paid again, because they feared that, if they didn't, the defendant would ensure that they'd lose what had essentially become very valuable, essentially sole source contracts at Mountain Laurel, contracts that weren't really subject to competition.

In his sentencing memo, he, himself, alleges that the vendors' bids and payments amounts were at the margins, higher than they needed to be, to ensure that they made the most money as possible at the expense of Arch Coal, money that they could then use to pay kickbacks, keep their business profits high, and keep their arrangement with Runyon going.

He could have ended this extortion with one word. He could have stopped the corruption. And he could have assured that Arch Coal got the very best contract price from each of the vendors, but he chose not to.

He could have leveled the playing field and invited competition between vendors in the Logan County area and maybe even had some new vendors at Mountain Laurel, but he didn't.

And it's true, as the defendant has pointed out today, that he has the most significant charge, and the most significant agreed upon guideline range in the plea agreements, but he was one of the last people to come in and cooperate, and he also had the most significant role in all of the schemes at Mountain Laurel, and I would ask the Court take that into consideration when determining how to sentence the defendant.

THE COURT:  Thank you, Ms. Thomas.

All right.  After consideration of the advisory guidelines and the other applicable factors from 18 U. S. C. Section 3553(a), including the guidelines, I am now ready to impose sentence.

Will the defendant please stand?

Mr. Runyon, you were a leader of a long-term extortion scheme that had the potential to be financially damaging to your employers and froze legitimate contractors out of doing a lucrative business at your mine.  This went on for years and netted you and others over a million dollars in cash kickbacks.  This is a serious offense requiring a just punishment.

I recognize that you have no criminal history and that you've been an otherwise productive and valued member of the community.  The letters on your behalf reflect that.

And I would note, everyone here, I think, agrees that you are a talented man and that this circumstance in which you find yourself now is a waste of that talent. I do believe that you're less likely to offend than most defendants that I see and pose little danger to the community.

However, this sentence is about deterrence and the seriousness of this offense. Now, the deterrent message of these cases has been muddled a bit by some of the problems that have popped up in these cases, but it is nonetheless an extremely important component of my sentencing decision.

Your crime was a raw abuse of the power that you held as a result of your position with your company. You appear to be very intelligent and you are very well educated and, for those reasons, you were able to avoid detection of this scheme for a very long time. It also means you should have known better.

Through these cases and another similar round of cases a couple of years ago involving Alpha, I've learned a great deal about the business corruption that exists in the coal industry. You were deeply involved in this corruption.

Everyone in West Virginia knows that the coal industry is under assault on multiple fronts and is struggling, to say the least. While your conduct may not have had an obvious impact on the industry as a whole, it is also clear that you and your cohorts in this case are by no means the only individuals involved in this kind of activity. And, while corruption

certainly isn't necessarily the greatest threat, it certainly does not help an industry that is already ailing.

This sentence needs to send a message to others in the coal industry. The message is that even smart people like David Runyon will eventually get caught, and when they do, serious penalties await business corruption in the coal industry.

I want to add something else. In previous hearings in these cases, I've characterized the vendors from whom you were receiving kickbacks as "victims." In point of fact, you're charged with extortion, and where there's extortion, there is necessarily someone who is a victim of that extortion.

Now, I recognize that the vendors here are not as pure as the wind driven snow. I do not see them as wearing white hats while you don a black hat. Nonetheless, without your power and approval behind this whole thing, I don't see it happening. I could say the same thing about Mr. Griffith and Mr. Herndon to a lesser degree.

I view those of you in the company, and you in particular, as most culpable because you controlled the massive purse strings of this company. You could have stopped this before it ever started. You didn't. Instead, you lined your pockets richly with tax free kickbacks, and now the lives of nine other individuals and their families and companies have been forever affected as a result.

I've considered your counsel's argument for a variance, but

1      I find that the deterrent message of these prosecutions, and this

2      sentence in particular, would be undermined by a variance in your

3      case.

4           Based on all of these factors, it is the judgment of this

5      Court that you be committed to the custody the Federal Bureau of

6      Prisons for a period of 41 months.

7           Upon release from prison, you shall be placed on supervised

8      release for a term of three years.

9           Within 72 hours of release from custody, you shall report in

10     person to the U. S. Probation Office in the district which you

11     are released.

12          While on supervised release, you must not commit another

13     federal, state or local crime; you must not possess a firearm or

14     other dangerous weapon; and you must not unlawfully possess a

15     controlled substance.

16          You also must comply with the standard terms and conditions

17     of supervised release as recommended by the U. S Sentencing

18     Commission and as adopted by this Court, including the standard

19     condition that you shall participate in a program of testing,

20     counseling and treatment for drug and alcohol abuse as directed

21     by your probation officer.

22          You must also abide by the special conditions of supervised

23     release as set forth in the local rules of this Court.

24          When I talk about restitution in a moment, I will have more

25     to say about special conditions of supervised release.

1       Given the substance abuse issues addressed in the

2   Presence Report, I do not find that you pose a low risk of

3   future substance abuse and, accordingly, I will order that you

4   submit to one drug test within 15 days of release and at least

5   two periodic drug tests thereafter as a condition of supervised

6   release.

7       In addition, you have paid substantial monetary penalties

8   already and are obligated to pay them additionally in the way of

9   restitution.  However, I believe that a fine of $15,000.00 would

10  be appropriate in this case and will be imposed.  And I will --

11  the -- if it's not paid within 15 days of today, interest will

12  accrue on that fine.

13      I note that you did pay the mandatory special assessment.

14      I am now ready to talk about restitution and, for that, you

15  may be seated.

16      With regard to mandatory restitution in Count 1, as I

17  understand it, the defendant has already paid in full the

18  $1,000,000.00 to the Court Clerk's Office, and I simply need to

19  enter an order directing the payment of that money to Arch Coal;

20  is that correct?

21          MS. THOMAS:  Yes, Your Honor.

22          THE COURT:  All right.  Well, I will include that in

23  the restitution portion of the J&C, but I do note that that

24  portion has been paid.

25      With regard to Count 2, I don't believe I'm authorized to

order restitution, but it has been agreed to in the plea
agreement, and I will, therefore, order it on the basis of the
agreement.

As I understand, the defendant has already paid -- and this
is to -- this is to go to the IRS.  The full amount was
$325,485.05.  The defendant has already paid $34,000.00, leaving
a balance of $291 -- I'm sorry, $291,485.05.

Is my math correct on all of that?

MR. ALLEN:  Yes, Your Honor.

THE COURT:  All right.  So, I find that that is the
full amount of the loss.

Now, there's mention in the Presentence Report, I think, of
a payment schedule.  How -- have the parties talked about how
that will be paid?

MS. THOMAS:  Your Honor, I believe that Mr. Runyon
agreed to pay at least $1,000.00 a month in restitution, but if
the Court looks at 18 U. S. C. 3572, a person who is sentenced to
restitution is supposed to make that payment immediately, unless
in the interests of justice, the Court finds that it needs to be
paid in installments.

I believe Mr. Runyon has a large amount of funds available,
but -- so I point that statute out to the Court in relationship
to making it immediately payable or not.

THE COURT:  Well, I think what I typically do, and you
got to it before I did, I will typically make financial

obligations in this case, the fine, and remaining restitution due immediately, but I will allow it to be paid on a schedule, if that's what the parties want.

Mr. Allen, is that what is contemplated?

MR. ALLEN:  Yes, Your Honor, and we would ask that we be allowed to take advantage of the agreed upon payment schedule. Mr. Runyon is going to pay this as quickly as he can, but we -- a lot was depending on what happened here today and how long he was going to be away.  He's got family that he needs to support, and a child that is in college, and we're trying to take those things into consideration in how much we can pay right now.

THE COURT:  All right.  Well, given the size of the obligation in comparison to his net worth, I will allow -- first of all, I will make payment of the restitution a special condition of his supervised release, but I will allow, at least initially -- I mean, I think if he's going to pay it all before the end of the supervised release, $1,000.00 a month isn't going to cover it, but it will be a starting point.  So, I will allow the $1,000.00 a month payment schedule, but I will make it a special condition of his supervised release that it be paid in full during the period of supervised release.  That includes both the restitution and fine.

And, also, given the net worth, I'm not going to waive the interest on the restitution.  So, the interest -- I don't know if the rules are similar on that.  I've never looked at that,

1    actually.

2         With regard to the fine, under 18 U. S. C. Section 3612(f),

3    that's the basis for interest accruing, if not paid within

4    15 days.  I don't know.  Does that apply to restitution or not?

5    I've never run across that question.

6         MS. THOMAS:  I would have to look into that, Your

7    Honor.  I don't know right here right now.

8         THE COURT:  All right.  Well, the only perimeter I'm

9    going to put on restitution is that it needs to be paid during

10   the -- at some point before the expiration of supervised release,

11   of the period of supervised release, and the incentive to pay

12   that sooner than later is the fact that there will be interest

13   accruing on it.  So -- but I will allow at least -- I will allow

14   the $1,000.00 a month payment schedule.

15        Those payments should -- will commence -- first of all,

16   during the period of incarceration, regardless of the financial

17   obligation, I generally direct that a defendant pay $25.00 per

18   quarter through the Inmate Financial Responsibility Program.

19   Then, the $1,000.00 a month schedule will kick in 30 days after

20   his release from custody and those payments should be forwarded

21   to the United States District Clerk's Office, 300 Virginia

22   Street, East, Charleston, West Virginia, 25301, for disbursement

23   provided that will cover both the -- well, I don't know what his

24   plans are with regard to payment of the fine, but for the time

25   being, that will -- actually, that will go first to the payment

1    of restitution and then the fine.  I think actually the law

2    requires that but, at any rate, it will be a special condition of

3    his supervised release that he pay both in full.

4        I will add, too, that in addition to deterrence, the payment

5    of the financial obligations was one of the reasons I've selected

6    a three-year term of supervised release.  I would simply notify

7    the defendant that if he is -- if he's current on the financial

8    obligations, that the Court would be willing to consider a

9    reduction in the supervised release period.

10       Now, we have in this court, I think, sort of an informal

11   rule, but it's a rule that the defendants almost always are

12   required to serve two-thirds of their period of supervision, but

13   the Court would be willing to consider, at that point, reducing

14   or terminating the term of supervised release if the financial

15   obligations are current.

16       With regard to these financial obligations, I want to add

17   the following special conditions of supervised release:

18       The defendant -- first, the defendant shall provide the

19   probation officer access to any requested personal or

20   business-related financial information;

21       Two, the defendant shall be prohibited from incurring new

22   credit charges or opening additional lines of credit without the

23   approval of the probation officer until all monetary obligations

24   have been satisfied;

25       And, three, the defendant shall apply all monies received

1    from income tax refunds, lottery winnings, judgments, and other

2    anticipated or unanticipated financial gains to any outstanding

3    court-imposed monetary obligation;

4        And, finally, the defendant shall cooperate with the IRS

5    with regard to the determination of the civil income tax

6    liability for himself individually for the tax years 2006 through

7    2013.  I think, for the most part, that's already been done, but

8    I'm going to include that as a special condition of supervised

9    release.

10        I would note, too, for the record, that in considering the

11    appropriate payment schedule that we've discussed today, I have

12    considered the defendant's financial resources and other assets,

13    his projected earnings and other income, and his financial

14    obligations, including those to dependents.

15        I would add, too, as this would be a condition related to

16    the financial obligations, that the defendant shall notify the

17    Court and the Attorney General, i. E., the Justice Department, of

18    any material change in his economic circumstances that may affect

19    his ability to pay restitution.

20        Upon receipt of such notice, the Court may adjust the

21    payment schedule or require immediate payment in full as the

22    interests of justice so require, and that is pursuant to 18 U. S.

23    C. Section 3664(k).

24        Mr. Allen, are there any recommendations that you or your

25    client would like for me to make to the Federal Bureau of

Prisons?

MR. ALLEN:  Yes, Your Honor.  We would ask that the Court recommend that Mr. Runyon be incarcerated at the camp in Ashland, Kentucky.  I understand that there's a camp there.

THE COURT:  All right.  He doesn't have any time in custody yet; is that correct?

MR. ALLEN:  I'm sorry, Your Honor?

THE COURT:  He doesn't have any time in custody yet; is that correct?

MR. ALLEN:  No time in custody.

THE COURT:  Okay.  Any other recommendations?

MR. ALLEN:  This is -- I don't think there's another facility that's any closer to his home down there in Delbarton, but the closest facility that we -- can I double check that and call your clerk with regard to location, if there's someplace that's closer than Ashland?

THE COURT:  You may.  You may.

I will make that recommendation that he be --

MR. ALLEN:  I understand McDowell has a camp.

THE COURT:  I know there's a facility there.  I don't know if there's camp there or not, to tell you the truth.

MR. ALLEN:  Let me call the clerk.

THE COURT:  All right.  Well, we'll make the recommendation either specifically, or in general, that he be designated to a camp as close to his home as possible.

MR. ALLEN:  And that he be permitted to stay on bond pending reporting, to self-report.

THE COURT:  That's another question, is there any objection to that?

MS. THOMAS:  No, Your Honor.

THE COURT:  All right.  I will allow the defendant to remain on his current bond pending reporting.  I will allow him to voluntarily surrender as directed by the United States Marshal Service.

I will also, given the -- again, the information I noted earlier in the Presentence Report, I will recommend that the Bureau of Prisons evaluate the defendant and place him in any and all appropriate drug treatment -- drug and alcohol -- more appropriately, alcohol treatment programs, including the RDAP Program that's offered by the Bureau of Prisons.

Mr. Runyon, I note there is a significant appeal waiver contained in your plea agreement.  As qualified by that waiver, you have the right to appeal the judgment of this Court.  Any notice of appeal must be filed with the Clerk not more than 14 days from the date of the entry of the judgement order.

If you desire counsel on appeal and you are unable to retain counsel, the appropriate Court will review a financial affidavit filed by you to determine whether or not to appoint counsel.

Do you understand your right to appeal and the 14-day filing requirement?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  I will place the Presentence Report under

3     seal subject to counsel's right to unseal as necessary for

4     appeal.

5        Any other matters we need to take up in this case?

6          MS. THOMAS:  Very briefly, Your Honor.  The United

7     States requested in its sentencing memo that the Court in its

8     restitution order include a breakdown of applicable tax loss.

9     It's set out in Paragraph 89 of the PSR.

10          THE COURT:  Would that be under the Restitution Section

11     of the J&C?

12          MS. THOMAS:  Yes, Your Honor

13          THE COURT:  All right.  And that was revised, so what's

14     -- the revised numbers are actually in one of the sentencing

15     memos, aren't they?

16          MS. THOMAS:  The revised numbers are in Paragraph 89 of

17     the PSR.

18          THE COURT:  All right.  All right.  Well, we will -- we

19     will incorporate those specifically in the J&C.

20          MS. THOMAS:  Thank you.

21          THE COURT:  Anything else we need to take up today?

22          MR. ALLEN:  No, Your Honor.  Thank you.

23          THE COURT:  All right.  Thank you.

24        (Proceedings concluded at 3:10 p.m., June 9, 2015.)

25

1    CERTIFICATION:

2        I, Ayme A. Cochran, Official Court Reporter, certify that

3    the foregoing is a correct transcript from the record of

4    proceedings in the matter of United States of America, Plaintiff

5    v. David E. Runyon, Defendant, Criminal Action No. 2:14-cr-00117,

6    as reported on June 9, 2015.

7

8    s/Ayme A. Cochran, RMR, CRR                    June 24, 2015

9    Ayme A. Cochran, RMR, CRR                          DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25